NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

25-P-1055                                      Appeals Court

   HAVERHILL STEM LLC & another[1]  vs.  LLOYD JENNINGS & another.[2]


                       No. 25-P-1055.

        Essex.     April 6, 2026. – July 13, 2026.

           Present:  Blake, C.J., Shin, & Wood, JJ.


Practice, Civil, Judgment notwithstanding verdict, New trial,
     Attorney's fees.  Privileged Communication.  Attorney at
     Law.  Law of the Case.  Massachusetts Civil Rights Act.
     Waiver.  Civil Rights, Availability of remedy, Attorney's
     fees, Motion for attorney's fees.  Libel and Slander.
     Conspiracy.  Damages, Attorney's fees.




     Civil action commenced in the Superior Court Department on
June 5, 2019.

     The case was tried before Elizabeth A. Dunigan, J.; motions
for judgment notwithstanding the verdict and for a new trial,
filed on January 13, 2025, were considered by her; and a motion
for an award of attorney's fees and costs, filed on January 21,
2025, also was heard by her.

     Alvin S. Nathanson for the defendants.
     Thomas K. MacMillan (Kristin M. Yasenka also present) for
the plaintiffs.

---

     [1] Caroline Pineau.

     [2] Brad Brooks.

BLAKE, C.J.  In this appeal, the defendants, Lloyd Jennings and Brad Brooks, appeal from a corrected judgment and posttrial order for attorney's fees that entered after a Superior Court jury found in favor of the plaintiffs, Haverhill Stem LLC (Stem) and its owner Caroline Pineau, on their claims for defamation, civil conspiracy, and violations of their rights under the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, § 11I.[3]  The defendants also appeal from an order dated February 21, 2025, which denied their motions for judgment notwithstanding the verdict and for a new trial.  Essentially, the defendants argue that the absolute litigation privilege shields them from civil liability for their statements and conduct that formed the bases of the plaintiffs' claims, the verdict was inconsistent, and the award of attorney's fees was time barred or, alternatively, unwarranted and an abuse of discretion.  For the reasons that follow, we reverse so much of the order dated February 21, 2025, that denied the motion for judgment notwithstanding the verdict on the claim for civil conspiracy.  The corrected judgment on that claim entered in favor of Pineau is vacated, and the case is remanded for entry of judgment for the defendants on the claim for civil conspiracy as well as recalculation of damages.

_____

[3] Judgment entered in favor of the defendants on the plaintiffs' G. L. c. 93A claim.

In all other respects, the corrected judgment and the order dated February 21, 2025, are affirmed.

Background.  We summarize the history of the case and the facts as the jury could have found them, reserving certain procedural details for later discussion.

The crux of the issue here arises from a dispute between abutting business owners.  The defendants own the property located at 128-130 Washington Street in the city of Haverhill (city), which leases residential units and a restaurant space in which Jennings held a business interest.  Pineau is the sole manager and member of Stem, a State-licensed cannabis retailer which leased 124 Washington Street, next to the defendants' property.[4]  Prior to Stem's lease, the defendants had constructed a deck at 124 Washington Street to resolve an issue with the previous owner of that property.[5]

As part of the process to open a retail marijuana dispensary, Pineau gathered signatures in support of Stem

---

[4] Pineau's father purchased 124 Washington Street and leased it to Stem.  The plaintiffs have since purchased the property from Pineau's father.

[5] The defendants had sought to build a deck behind their own building at 128 Washington Street.  The prior owner of 124 Washington Street raised concerns that the defendants' proposed deck extended onto his property; that dispute was resolved by the defendants paying $30,000 to also build a deck behind 124 Washington Street.  See Haverhill Stem LLC v. Jennings, 99 Mass. App. Ct. 626, 628 (2021).

opening the store in the downtown business district in which the properties are located.  Later, she applied for a special permit for Stem as required by the applicable zoning ordinance.[6]  Pineau also contacted her immediate abutters, including Brooks, to inform them of her intent to open a marijuana dispensary.  After speaking to Brooks, Pineau met with him in person, and he demanded $30,000.  Pineau testified that when she initially told Brooks about Stem's lease, he told her, "[Y]ou sure as hell better bet me and my partner [Jennings] are going to get our $30,000 back for the deck that we built."  Pineau further testified that Brooks said, "[M]y partner and I said whoever goes in that building owes us $30,000 for the deck."

Altogether, the defendants met with Pineau, her husband, her and Stem's attorney, or some combination of them about eight times between July 2018 to June 2019.  At the first formal meeting with the defendants, Pineau and her husband met them at a location of their choosing; when Pineau and her husband arrived, the "office was very dark" and only the defendants were present.  The defendants led Pineau and her husband "down a long, dark hallway into a conference room" and told Pineau that

_____

    [6] In January 2019, the city enacted and adopted a zoning ordinance entitled "An Ordinance Relating to Adult Use of Marijuana and Marijuana Establishment."  The zoning ordinance provided regulations as to the permissible uses of property and structures in certain districts, including the use of recreational retail marijuana establishments.

"they felt disrespected, that [she] hadn't approached them prior to purchasing the [property] to ask for their permission." Pineau testified that Jennings, who had more of an interest in the restaurant, did most of the talking. In addition to the monetary demand, Pineau was told that it was important for the restaurant to have access to her deck.

Whenever Pineau's husband left the room, Jennings became "increasingly more aggressive in tone," to the point that Pineau "was feeling very uncomfortable." Jennings told her, "You ain't from this town, [Brooks] and I are. I grew up on these streets, and I didn't grow up rich." Pineau testified,

> "They told me that whoever purchased the property, that it came with this $30,000 vendetta. They didn't care what went into the building. They were going to fight it every step of the way and put whatever went in through the same hell with the city that they went through."[7]

In March 2019, the defendants met with Pineau and her attorney. At this meeting, the defendants again demanded $30,000 and use of the plaintiffs' deck. Jennings told the plaintiffs' attorney that Pineau and her husband "didn't know

---

[7] This testimony was supported by Pineau's husband as well as by another business owner, who testified that Brooks told him,

> "[The defendants] had this vendetta, and it was going to be against anybody who tried to do anything with the . . . property and I said to [Brooks] . . . I tried to buy that thing four or five different times, so if it was me you were going to try to beat me up for $30,000 and he said yes and he was adamant about it."

who [they] were dealing with and [the defendants] were going to fight [the plaintiffs] every step of the way."

The defendants told other people in the community, including members of the city council and the mayor, that Pineau owed them $30,000. Pineau's husband testified that six or seven people in the community, including the mayor, asked him about the $30,000 debt that the plaintiffs allegedly owed the defendants.

Although Pineau offered the defendants about $20,000 "[t]o make [the defendants'] behavior stop and stop intimidating [her]," Pineau did not ultimately pay the defendants.

As time passed, the defendants eventually increased their demands from $30,000 to over $75,000. In April 2019, Pineau's husband met with the defendants again to hear their demands. Pineau's husband testified that Jennings told him that if the plaintiffs did not make the payment, "I can promise you that I'm going to take everything from [Pineau], I'm going to destroy her, and I don't care if that stops at me taking your house -- taking your house from you." He reiterated, "I want to take everything from her." Jennings further told Pineau's husband that "if they weren't going to get use of the deck, then the price was going to be upwards of -- much higher than $75,000,"

and the defendants "were looking to file a RICO[8] lawsuit" against the plaintiffs.  Jennings concluded the meeting by asking whether Pineau's husband "heard the rumor going around about [Pineau] . . . sleeping with" another business owner so that Stem could "get a favorable ruling . . . on [the] zoning dispute" concerning the retail marijuana dispensary.

After this meeting, Pineau filed a report with the Haverhill police department because she was fearful of the defendants harming her business, her home, and her person. Afterward, the defendants called Pineau's husband "saying they were extremely pissed off that [the plaintiffs] had gone to the police over this."

In May 2019, the defendants filed a complaint in the Land Court challenging the zoning ordinance.  The complaint named the plaintiffs and the city as defendants.  One month later, the plaintiffs filed the instant complaint against the defendants in the Superior Court, alleging violations of the MCRA, unfair and deceptive trade practices under G. L. c. 93A, civil conspiracy, and defamation.[9]  While litigation was pending in both cases, the

---

[8] The Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), was enacted as Title IX of the Organized Crime Control Act of 1970, as a comprehensive criminal and civil remedy to be used against organized criminal activity.

[9] The plaintiffs also made claims of civil harassment and intentional interference with contractual and economic relationships, which were both disposed of prior to trial.  The

plaintiffs applied to the city for the special permit to open the dispensary.  The defendants spoke in opposition to the plaintiffs' request for the special permit at the public hearing on June 18, 2019.  The special permit was nevertheless granted and filed with the city clerk in September 2019.  That same month, the defendants filed a second Land Court complaint against the city and the plaintiffs (among others) challenging the issuance of the special permit.

While no formal meetings occurred between the parties after the filing of the instant complaint, interactions did occur, resulting in Pineau's filing of an application for a harassment prevention order against Jennings.  At trial, Pineau read from her October 2019 affidavit filed in support of the application, which was admitted as an exhibit along with the full report.[10] She detailed the following:

----

claim for civil harassment was dismissed on the defendants' first motion to dismiss in March 2020.  The plaintiffs voluntarily dismissed their claim for intentional interference with contractual and economic relationships.

[10] As the trial judge noted in her posttrial memorandum of decision and order on the defendants' motions for judgment notwithstanding the verdict and for a new trial, "[e]vidence of allegations that defendant Jennings threatened to burn down the deck was introduced at trial jointly by the parties as an agreed-upon exhibit" (emphasis added).  The judge ultimately instructed the jury that the report and the affidavit were provided for a limited purpose -- "to show the nature of the relationship between the parties and the series of events that occurred between them during this time period."

"On or about September 30, 2019, the defendant, Lloyd Jennings, entered into my building at 124 Washington Street . . . . This harassment has escalated over the past 12 months, and it is intensifying now with Mr. Jennings coming into my property without warning. . . . Jennings uses his criminal reputation to bolster his threats. I was told he was threatening to burn down my deck, take my home from me, and I am extremely fearful for me, my two-year-old [child], who is often at work with me. Mr. Jennings then increased his threats from 30K to 50K to $75,000. The harassment continues on a daily basis, and I'm asking for the court's help in protecting my safety."

The incident described above did not result in formal charges or issuance of a harassment prevention order against Jennings.

Pineau testified to other intimidating behavior by Jennings, such as an incident in December 2019, in which she arrived home and discovered Jennings parked in front of her house. Pineau testified that after she brought her child inside her home, Jennings "slowly drove by my house and stared me down, and then he pulled into the driveway across the street from my house, did a three-point turn and, again, proceeded to drive slowly by my driveway and stare me down."

Stem eventually opened in May 2020. Pineau testified that, in addition to the defendants' opposition to the zoning ordinance and the special permit, the defendants caused delays in the plaintiffs' construction by calling State and Federal regulators "multiple times," prompting inspectional visits. Because of the delays caused by the defendants' lawsuits and interference with construction of the store, the plaintiffs lost

expected revenue -- approximately "a million dollars a month" -- during the "six to eight months'" delay.

In June 2020, the Land Court granted summary judgment in favor of the city and the plaintiffs on the defendants' complaint challenging the zoning ordinance.  That judgment was later affirmed by a panel of this court.[11]  At that time, the defendants voluntarily dismissed their appeal from the special permit that was pending in the Land Court.

After the defendants pursued two unsuccessful interlocutory appeals from orders on their special motion to dismiss this matter, which we will discuss in more detail infra, trial ensued in December 2024.  On December 12, 2024, the jury returned a verdict for Stem on the MCRA claim as against Jennings, for Pineau on the civil conspiracy claim as against both defendants,[12] and for Pineau on the defamation claim as against both defendants.  A corrected judgment ultimately entered on December 23, 2024.

On January 13, 2025, the defendants filed their motions for judgment notwithstanding the verdict and for a new trial, which were denied by the trial judge on February 21, 2025.

---

[11] See Brooks v. Haverhill, 100 Mass. App. Ct. 1105 (2021).

[12] The jury found that Stem proved the defendants engaged in a civil conspiracy but did not prove harm or damage to Stem, and judgment entered in favor of the defendants on this claim.

On January 10, 2025, Stem filed its notice of intent to file a motion for an award of attorney's fees and costs pursuant to G. L. c. 12, § 11I.  On January 21, 2025, Stem filed its motion for an award of attorney's fees and costs.  On April 10, 2025, the trial judge held a hearing on the motion.  On May 8, 2025, the trial judge awarded Stem $174,630 for attorney's fees and $4,113.25 in costs, for a total of $178,743.25.

Discussion.  1.  Standards of review.  The defendants preserved their claims at trial and in postjudgment motions for judgment notwithstanding the verdict and for a new trial.  Construing the evidence in the light most favorable to the nonmoving party, we evaluate the denial of a motion for judgment notwithstanding the verdict to determine "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of the [nonmovant].'"  O'Brien v. Pearson, 449 Mass. 377, 383 (2007), quoting Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 121 (1992).  Our review of the denial of a motion for new trial is for an abuse of discretion "when the argument on appeal is based on the weight of the evidence, whether the damages awarded are excessive, or the impact of newly discovered evidence."  Fyffe v. Massachusetts Bay Transp. Auth., 86 Mass. App. Ct. 457, 471 (2014).  The prejudicial error standard governs our review of

the claims before us on direct appeal from the corrected judgment. See id. at 470-471; Wahlstrom v. JPA IV Mgt. Co., 95 Mass. App. Ct. 445, 448 (2019).

2. Jury verdict. a. Absolute litigation privilege. The litigation privilege, "which precludes civil liability based on communications made by a party, witness, or attorney in connection with judicial proceedings or contemplated litigation," does not protect the defendants from liability in these circumstances. Bassichis v. Flores, 490 Mass. 143, 144 (2022). Notably, as this issue was already appealed and no new evidence was adduced at the trial that would change the outcome of the earlier decision of a panel of this court, we conclude that, under the law of the case, the absolute litigation privilege does not protect the defendants. See Kitras v. Aquinnah, 474 Mass. 132, 146, cert. denied, 580 U.S. 1000 (2016).

We now recite the fairly complex procedural history on this issue in some detail. This court has twice considered and rejected the defendants' arguments. See Haverhill Stem LLC v. Jennings, 99 Mass. App. Ct. 626, 628 (2021) (Stem I); Haverhill Stem LLC v. Jennings, 102 Mass. App. Ct. 1121 (2023) (Stem II).[13]

---

[13] Twice the Supreme Judicial Court denied further appellate review. See 492 Mass. 1106 (2023); 488 Mass. 1102 (2021).

In their July 2019 motion to dismiss the complaint pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), and the "anti-SLAPP" statute, G. L. c. 231, § 59H, the defendants argued that their allegedly defamatory statements were preliminary to municipal hearings and, therefore, privileged.  After a Superior Court judge (first motion judge) denied the special motion to dismiss, the defendants appealed under the doctrine of present execution.[14]  Stem I, 99 Mass. App. Ct. at 630-635.  In a published opinion, we affirmed the first motion judge's order denying the special motion to dismiss.  Id. at 635.  We concluded that the defendants' conduct was unconnected to the litigation -- namely, the two Land Court cases and the special permit proceeding -- as "the alleged statements at issue [were] that the defendants would use litigation to obtain monetary relief and thereby cause [Pineau's] financial ruin"; monetary relief, however, "could not be obtained as a result of the

---

[14] The claim for civil harassment was dismissed at this stage under rule 12 (b) (6), while the claim for interference with contractual relationships was voluntarily dismissed.  See note 9, supra.  After docketing their interlocutory appeal in Stem I, the defendants answered the complaint in this action and filed counterclaims for abuse of process, malicious prosecution, and MCRA violations.  The plaintiffs moved to dismiss the counterclaims pursuant to the anti-SLAPP statute.  A different Superior Court judge allowed that motion, leading to a statutory award of attorney's fees against both defendants in the amount of $9,630.  That award became part of the corrected judgment and is not at issue here.

contemplated Land Court litigation." Id. at 636. Additionally, we held "that the alleged statements that the defendants claim are privileged fairly can be viewed as part of the conduct of extortion" under G. L. c. 93A, and that the privilege would not attach where "the statements are being used as evidence of the defendants' misconduct." Id. at 636-637. See Gillette Co. v. Provost, 91 Mass. App. Ct. 133, 140-141 (2017).

Shortly after release of our decision in Stem I, the Supreme Judicial Court decided in Bassichis, 490 Mass. at 144, that an attorney's conduct during litigation was shielded from civil liability under the litigation privilege. In the trial court, the defendants renewed their motion to dismiss based on the holding in Bassichis, supra. Another judge of the Superior Court (second motion judge) denied this motion. The defendants filed a second present execution appeal, in which a panel of this court affirmed the second motion judge's order denying the renewed motion to dismiss. See Stem II, 102 Mass. App. Ct. 1121. In Stem II, the panel concluded that Bassichis, supra, neither overruled Stem I nor controlled this case. Importantly, even had Bassichis cast doubt on Stem I, the panel noted that the Supreme Judicial Court did not "change the requirement that the communications and conduct have 'some relation to the proceeding.'" Stem II, supra, quoting Bassichis, supra at 150. The defendants "were not entitled to use the shield of the

litigation privilege to make threats or false statements that were unrelated to the subject of the contemplated city council and Land Court proceedings." Stem II, supra. See Hoar v. Wood, 3 Met. 193, 197 (1841) (litigation privilege is unavailable where party or counsel uses opportunity "to gratify private malice by uttering slanderous expressions . . . which have no relation to the cause or subject matter of the inquiry"). Even when broadly considered, the statements and conduct alleged in the complaint had no "reasonable relation or reference to the subject of inquiry" and could not "possibly be pertinent" to the ongoing litigation or the permit process and, therefore, were outside the scope of the litigation privilege. Stem II, supra, quoting Aborn v. Lipson, 357 Mass. 71, 73 (1970).

The analysis in Stem II remains apt to the facts presented to the jury and, therefore, constitutes the law of the case. Under the law of the case doctrine, we will not "reconsider questions decided upon an earlier appeal in the same case." King v. Driscoll, 424 Mass. 1, 8 (1996), quoting Peterson v. Hopson, 306 Mass. 597, 599 (1940). "An already decided issue should not be reopened 'unless the evidence on a subsequent [proceeding] was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.'" Kitras, 474 Mass. at 146, quoting King,

supra. None of those circumstances are present here -- no controlling authority has since made a contrary decision of law applicable to the facts adduced at trial, and the decision was not clearly erroneous. Further, although the defendants argue that "nearly all those facts [alleged in the complaint] and additional facts were presented to this jury," they have not identified any additional fact at trial that would have yielded a different result than in Stem II.

Regardless, even if the decision in Stem II did not establish the law of this case, we conclude that the defendants' statements and conduct in totality are not protected by the privilege. As noted in Stem II, the defendants were acting as "individuals," not attorneys.[15] Where the litigation privilege pertains to nonattorney parties, it allows them to make "communications preliminary to litigation," Sriberg v. Raymond, 370 Mass. 105, 109 (1976), and "to testify without fear of civil liability," Bassichis, 490 Mass. at 152, in connection with a judicial proceeding. "The purpose of the litigation privilege is twofold: to encourage 'zealous advocacy' by attorneys and to

---

[15] Importantly, Bassichis noted that the litigation privilege would not completely shield an attorney from wrongdoing, as other remedies -- such as court room sanctions, contempt proceedings, and Board of Bar Overseer disciplinary proceedings for violations of the rules of professional responsibility -- exist "to discourage and sanction attorney misconduct." Bassichis, 490 Mass. at 153.

promote 'full disclosure' by witnesses, without the fear of civil liability."  Mackie v. Rouse-Weir, 495 Mass. 252, 261 (2025), quoting Bassichis, supra at 151-152.  See, e.g., Mackie, supra at 264-265 (extending privilege to nonattorney's reports prepared in anticipation of hearing); Aborn, 357 Mass. at 72-73 (litigation privilege shielded nonattorney witness for defamatory statements about plaintiff made in testimony given at hearing); Mezullo v. Maletz, 331 Mass. 233, 236-237 (1954) (litigation privilege shielded nonattorney witness for declarations made in commitment proceedings).  For example, a nonattorney's complaint in a court of proper jurisdiction and words spoken in that court constitute words "spoken in the course of judicial proceedings, and being pertinent to the matter in hearing, [a]re absolutely privileged."  Laing v. Mitten, 185 Mass. 233, 235 (1904).  As relevant here, judicial proceedings include sworn testimony before a legislative committee.  See Sheppard v. Bryant, 191 Mass. 591, 593 (1906). Under this lens, there would be no civil liability for the defendants' statements, even if made in bad faith and with malice, in their Land Court lawsuits and their testimony at the public hearing on the special permit; however, the bulk of their conduct forming the bases for the plaintiffs' claims occurred not within a judicial proceeding or preliminary to litigation, but were demands purposefully relayed down darkened hallways, in

Pineau's driveway at her residence, at coffee shops, and at Stem's property without invitation to effect relief to which the defendants would not be entitled under any litigation presently occurring or plausibly considered.[16]

Moreover, the defendants' statements and conduct were unrelated to their Land Court litigation or the special permit proceedings. The defendants' combined statements and conduct -- which included, among other things, threatening to file a RICO lawsuit when they took no steps toward actually filing (and which, if filed, would not have yielded use of the plaintiffs' deck as relief), threatening to "destroy" Pineau financially and to take her home, telling other members of the community that Pineau owed them $30,000 when she did not, and demanding payment for and the use of a deck built prior to Stem's lease -- exceeded the scope of the litigation privilege as they were all wholly unrelated to either judicial proceeding. See Gillette Co., 91 Mass. App. Ct. at 141 (litigation privilege did not attach to party's "sending letters threatening a baseless lawsuit with the knowledge that [recipient] would have to disclose them to potential partners and investors, and then

---

[16] As noted earlier, while the defendants told Pineau's husband that they "were looking to file a RICO lawsuit" against the plaintiffs, the defendants did not file such a lawsuit. Additionally, they made no mention of considering such a lawsuit in their brief or in their testimony at trial.

actually filing a baseless lawsuit, all as a means to prevent [recipient] from competing in the . . . market").

b. <u>MCRA and defamation claims</u>.  Contrary to the defendants' arguments, the jury could have reasonably found in favor of Stem on the MCRA claim as against Jennings, and in favor of Pineau on the defamation claim as against both defendants.  It follows that the judge correctly denied the motions for judgment notwithstanding the verdict or for a new trial on these claims.

i. <u>MCRA</u>.  The defendants claim that the MCRA verdict was inconsistent and contrary to the evidence at trial because the jury returned a verdict for only Stem, not Pineau, on the MCRA claim, and not for Stem on any other claims.  First, this claim is waived, as the defendants did not timely raise it before the jury were discharged.  Where a party "contends that the jury were confused and their verdict was inconsistent with the uncontroverted evidence," that "party must request the judge to instruct the jury to reconsider their verdict before they are discharged and when there is time to correct any inconsistency." <u>Kuwaiti Danish Computer Co</u>. v. <u>Digital Equip. Corp</u>., 438 Mass. 459, 466 (2003).  "Failure to make such a timely request constitutes a waiver of any challenge to the verdict on the ground that it is inconsistent."  <u>Id</u>.

Second, even if the claim was not waived, the jury could have reasonably found that Jennings, through the use of threats, intimidation, or coercion against Pineau as the sole agent of Stem, interfered with, or attempted to interfere with, Stem's exercise or enjoyment of its rights to seek a special permit and use and enjoy the property.  A violation of the MCRA requires the plaintiff to prove "that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'"  Haufler v. Zotos, 446 Mass. 489, 504 (2006), quoting Bally v. Northeastern Univ., 403 Mass. 713, 717 (1989).  The "right to use and enjoy one's own property is constitutionally secured."  Haufler, supra.  That includes the right to seek the issuance of a permit for use of property, even if there is no right that a permit issue.  See Kennie v. Natural Resource Dep't of Dennis, 451 Mass. 754, 762 (2008).

The jury heard testimony from Pineau, her husband, and another business owner that Jennings repeatedly demanded money from Pineau as well as use of the deck[17] and, when given neither,

_____

[17] Incidentally, the jury heard testimony that, had the plaintiffs granted Jennings the use of their deck, the plaintiffs likely would not have been successful in obtaining their licensing as the Cannabis Control Commission was concerned

Jennings said that he would do everything he could to "destroy" Pineau and put her through "hell."  Pineau also testified that Stem's opening was beset by delays from unexpected safety inspections prompted by calls from the defendants.  All acts directed at Pineau as the sole manager and member (i.e., agent) of Stem necessarily affected Stem, just as Stem's right to pursue the permit and use the property as it chose necessarily affected Pineau.  As Stem could "only act through its agent[]," Pineau, Jennings's actions against Pineau deprived Stem of the use of its property.  See Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C., 425 Mass. 63, 69 (1997).  Cf. Merrimack College v. KPMG LLP, 480 Mass. 614, 615 (2018) ("traditional principles of agency law . . . impute the wrongdoing of those agents to the plaintiff organization"); Sunrise Props., Inc., supra at 67 ("under ordinary agency principles, [agent's] knowledge is imputed to" corporation). Accordingly, based on the evidence, the jury could have found that the actions were not directed at Pineau individually, but at her as Stem's agent.  We also note that, under the MCRA, Stem had standing to pursue (and did pursue) remedies for such interference with its property rights by Jennings.  See Pheasant

---

about the building's security, and another business's use of the deck would have presented a significant security risk.

Ridge Assocs. Ltd. Partnership v. Burlington, 399 Mass. 771, 780-781 (1987) ("no doubt" that plaintiffs, which included corporations and limited partnership, had right to seek permit, and that right was interfered with by defendant under MCRA). See also Howcroft v. Peabody, 51 Mass. App. Ct. 573, 592-593 (2001), quoting G. L. c. 4, § 7, Twenty-third (under MCRA, "person" includes "corporations, societies, associations and partnerships"). Accordingly, the jury could have reasonably concluded that Jennings made threatening statements to Pineau, acting as an agent of Stem, in an attempt to prevent Stem from opening and enjoying the use of its property.

ii. Defamation. The evidence also supports the jury's findings that the defendants made statements concerning Pineau to a third party, those statements could damage Pineau's reputation in the community, the defendants were at fault in making the statements, and the statements caused Pineau economic loss. See Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-630 (2003). There is no merit to the defendants' argument that the verdict for Pineau was erroneous as Pineau was not the real party in interest because Stem was the lessee of the property and the applicant for the special permit. See Sunrise Props., Inc., 425 Mass. at 69. Pineau testified about the economic losses she incurred as the owner of Stem and about the harm to her business reputation. Additionally, whether the statements

at issue were opinion rather than fact was "a question [for the jury,] if the statement[s] reasonably can be understood both ways" as the defendants argue. King v. Globe Newspaper Co., 400 Mass. 705, 709 (1987), cert. denied, 485 U.S. 940 and 485 U.S. 962 (1988). Adequate evidence was produced to allow the jury to determine that the statements that Pineau owed Brooks and Jennings $30,000 were statements of fact, that they were false, and that they prejudiced Pineau's business. This was supported by Pineau's testimony concerning Stem's delayed opening and loss of revenue during that delay as well as her husband's testimony that he was questioned by prominent community members about the alleged debt.

c. Civil conspiracy. The defendants correctly argue that, based on the verdict and jury instructions, the jury could not have reasonably found "an underlying tortious act" to support the conspiracy judgment. Bartle v. Berry, 80 Mass. App. Ct. 372, 383-384 (2011). Over the defendants' objections, the judge instructed the jury that the underlying tort was "to extort $30,000 from Caroline Pineau." When the jury later asked the judge for "the formal definition of 'extortion,'" the judge answered, relying on language in Stem I, 99 Mass. App. Ct. at 634, that extortion "is coercion by improper means that is designed to reap an economic reward." Had the jury instruction additionally identified another recognized tort as the possible

basis of the conspiracy claim, such as one outlined in the MCRA or defamation claims and on which the jury found in favor of the plaintiffs, the verdict could have stood; however, given the instruction, the judgment as to the civil conspiracy claim against the defendants cannot stand.

While the defendants are correct that "extortion" is not a recognized civil tort in the Commonwealth, see Leventhal v. Dockser, 361 Mass. 894, 894 (1972), we do not necessarily agree with the defendants' argument that the judge erroneously instructed the jury as to the underlying claim of "extortion," where the so-called extortion here could constitute tortious conduct under G. L. c. 93A, which the plaintiffs claimed. In Stem I, 99 Mass. App. Ct. at 634, we described "extortion -- coercion by improper means that is designed to reap an economic reward" -- as actionable "in the business context . . . under c. 93A." As we noted above in note 3, however, the plaintiffs' tort claim for unfair and deceptive trade practices under G. L. c. 93A failed. Thus, "the plaintiffs' claims that the defendant[s] . . . conspired against them necessarily fails." Bartle, 80 Mass. App. Ct. at 384. The instruction was not necessarily error standing alone; the error was that the instruction tied the verdict on the conspiracy claim to an underlying tort for which the jury found the defendants had no liability.

3. _Attorney's fees_.  We review an award of attorney's fees for abuse of discretion and will reverse the judge's decision "only if it is clearly erroneous."  _WHTR Real Estate Ltd. Partnership_ v. _Venture Distrib., Inc._, 63 Mass. App. Ct. 229, 235 (2005).  As discussed below, Stem's motion for an award of attorney's fees was timely, especially where the defendants were on notice of the request for the fees, some of which were statutory.  Additionally, because the plaintiffs' claims were so intertwined, we do not consider the judge's attorney's fee award unreasonable.

a. _Timely filed_.  The defendants argue that Stem's motion for attorney's fees and costs pursuant to the MCRA fell under Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974), and was thus time barred.  We disagree.[18]  There is no specific procedural rule in Massachusetts that addresses the timely filing of fee petitions in the trial court.  See _Society of Jesus of New England_ v. _Boston Landmarks Comm'n_, 411 Mass. 754, 756-757 (1992) ("The determination of timeliness is . . . within the discretion of

---

[18] The defendants also argue that "a prevailing party's claim for attorney's fees can only be and must be resolved before the entry" of final judgment and be part of the final judgment as per Mass. R. Civ. P. 54 (a), 365 Mass. 820 (1974). As reflected on the docket, the fee award is not a "second judgment" as the defendants argue but instead an order collateral to the corrected judgment and, therefore, not governed by this rule.  See _Vermont Mut. Ins. Co_. v. _Poirier_, 490 Mass. 161, 169 (2022).

this court").  In fact, comparing the analogous Federal rule, Fed. R. Civ. P 59(e), the language of Federal and Massachusetts rules 59 (e) are substantially the same.  See Anyaosah v. Copart of Conn., Inc., 106 Mass. App. Ct. 213, 216 (2025) ("In construing our rules of civil procedure, we are guided by judicial interpretations of the cognate Federal rule absent compelling reasons to the contrary or significant differences in content" [citation omitted]).  The United States Supreme Court has held that a "motion for attorney's fees [in a civil rights action] is unlike a motion to alter or amend a judgment," and "therefore, not governed by the provisions of [Federal] Rule 59(e)" because the award petition "does not imply a change in the judgment, but merely seeks what is due because of the judgment" (citation omitted).  White v. New Hampshire Dep't of Employment Sec., 455 U.S. 445, 452 (1982).  Further, the Supreme Judicial Court has held that a motion for statutory attorney's fees is not a motion to alter or amend the judgment.  See Dugan v. Selectmen of Dartmouth, 413 Mass. 641, 643 (1992) (discussing indemnification under G. L. c. 258, § 13).

The motion for attorney's fees was timely under these circumstances.  The corrected judgment ultimately entered on December 23, 2024.  Stem filed notice of its intent to request attorney's fees under the MCRA on January 10, 2025, and filed its motion for award of fees shortly thereafter on January 21,

2025. The corrected order awarding fees issued on May 8, 2025. We do not think that the defendants have suffered unfair surprise or prejudice, because the MCRA placed the defendants on notice that fees "shall" be awarded, G. L. c. 12, § 11I, and the plaintiffs pursued attorney's fees and costs at multiple stages of the litigation. On these facts, Stem's motion for attorney's fees, filed within thirty days from entry of the judgment, was reasonable. See Dugan, 413 Mass. at 642-643 (motion for attorney's fees not untimely when filed six months after judgment). As we conclude that no judicial or procedural rule governs the timeliness of the fee petition at issue, the filing date here was not unreasonable given the statutory basis for a fee award along with the complexities and procedural history of this case.

b. Award amount. The defendants' argument that the fees awarded here, $178,743.25, were "not only preposterous" but "completely unwarranted, unjustified and an abuse of discretion," is belied by the record. "[M]uch discretion must be allowed to the trial judges, and rarely should they be reversed if there is assurance that they have dwelt on the relevant considerations and have stayed within permissible evidentiary bounds." Robbins v. Robbins, 19 Mass. App. Ct. 538, 543 (1985), S.C., 22 Mass. App. Ct. 982 (1986). The trial judge's "award [of attorney's fees] is presumed to be right and

will not be disturbed without a showing that the fee is excessive." Keville v. McKeever, 42 Mass. App. Ct. 140, 155-156 (1997). On this record, the judge acted reasonably within her discretion in awarding the fees.

The jury awarded $7,500 damages to Stem against Jennings on the MCRA claim, $90,000 to Pineau against both defendants on the conspiracy claim, and $15,000 to Pineau against each defendant on the defamation claim. Stem sought to recover all its fees incurred in the entire case for all plaintiffs and for all counts, claiming that it was impossible to separate Stem's fees from Pineau's as well as the fees incurred in litigating the various claims. On appeal, Stem maintains that even though it did not prevail on all claims, the ones that failed were "sufficiently interconnected" with the MCRA claim and arose out of "a common nucleus of facts." See Wodinsky v. Kettenbach, 86 Mass. App. Ct. 825, 838-839 (2015) (no abuse of discretion in awarding attorney's fees even though plaintiffs "did not prevail on all of their claims," because "the claims on which [they] were not successful were 'sufficiently interconnected' with the claims on which they did prevail" [citation omitted]). We agree and note that it is settled law that fee awards need not always be proportional to the damages recovered. See, e.g., Hidalgo v. Watch City Constr. Corp., 497 Mass. 319, 324-325 (2026) (proper question on appeal of attorney's fee award is whether attorney's

work, "not the monetary value of the . . . claims, warranted [the] fees"); Killeen v. Westban Hotel Venture, LP, 69 Mass. App. Ct. 784, 792 (2007) ("fee award need not be proportionate to the damages recovered" where verdict serves important public purpose).

The judge was "in the best position to determine how much time was reasonably spent on [the] case, and the fair value of the attorney's services." Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993). She outlined the case's extensive procedural history, which she concluded was "particularly relevant to resolution of" the attorney's fee petition, as well as diligently explained the basis of her decision. While the "results obtained by a claimant may affect the determination of attorney's fees," School Comm. of Norton v. Massachusetts Comm'n Against Discrimination, 63 Mass. App. Ct. 839, 853 (2005), this is not the only factor. A judge may permissibly consider several factors, none of which is solely determinative, including

> "the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases."

Berman v. Linnane, 434 Mass. 301, 303 (2001), quoting Linthicum v. Archambault, 379 Mass. 381, 388-389 (1979).

Furthermore, "a significant attorney's fee may be upheld because of the importance of providing an incentive to attorneys to represent litigants . . . who seek to vindicate . . . rights but whose claim may not result in substantial monetary compensation and because of the deterrent impact of such litigation" (quotation and citation omitted).  School Comm. of Norton, 63 Mass. App. Ct. at 854.  See Hidalgo, 497 Mass. at 326 (reducing fee award based on damages "impermissibly minimizes the importance of such claims and risks disincentivizing lawyers from taking . . . cases").

Here, the judge, who also presided over the trial, noted the case's five-year history and that the defendants "aggressively litigated this case, filing voluminous motions, motions to reconsider denials of those motions, and then, appeals of those denials, in many instances repeatedly raising issues that were previously resolved by the court," which, "undoubtedly, contributed significantly to the complexity and amount of time the [p]laintiffs' counsel spent litigating this matter."  We agree and therefore affirm the award of attorney's fees.

Although we vacate so much of the corrected judgment that relates to civil conspiracy, this does not require a reduction in the attorney's fee award.  First, the defendants have made no arguments on appeal that the attorney's fee award should be

reduced in the event of a reversal on one of the claims, so we need not decide the issue. Second, we note that a judge is not required to reduce an award for the result obtained. See J.P. Constr. Co. v. Stateside Bldrs., Inc., 45 Mass. App. Ct. 920, 921 (1998) ("we reject the defendants' argument that the award of reasonable attorney's fees must be proportioned strictly to the award obtained"). See also Hidalgo, 497 Mass. at 320 (error to reduce attorney's fee award because it "was disproportionate to the relatively low amount of damages at stake"); Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 631-632 (1992) (reasonable attorney's fees not limited to "percentage of fees equal to percentage of [amounts] recovered").

c. Appellate attorney's fees. Finally, the plaintiffs' request for appellate attorney's fees is denied. A party must request appellate attorney's fees, and the basis for such, in their brief. See Mass. R. A. P. 16 (a) (10), as appearing in 481 Mass. 1628 (2019). The plaintiffs' request for appellate attorney's fees in their brief was based on the alleged frivolousness of the defendants' appeal. The defendants, however, have raised at least one significant issue on direct appeal, which defeats the plaintiffs' request for appellate attorney's fees under Mass. R. A. P. 25, as appearing in 481 Mass. 1654 (2019), and G. L. c. 231, § 6F, as the appeal was not entirely frivolous. The plaintiffs have not requested fees

under any other authority, and we decline to exercise our discretion to award them.  See <u>Fabre</u> v. <u>Walton</u>, 441 Mass. 9, 10 (2004); <u>Haser</u> v. <u>Wright</u>, 65 Mass. App. Ct. 903, 903 (2005).

<u>Conclusion</u>.  For the reasons stated, we reverse so much of the order dated February 21, 2025, that denied the motion for judgment notwithstanding the verdict on the claim for civil conspiracy.  The corrected judgment on that claim entered in favor of Pineau is vacated, and the case is remanded for entry of judgment for the defendants on the claim for civil conspiracy as well as recalculation of damages.  In all other respects, the corrected judgment and the order dated February 21, 2025, are affirmed.

<u>So ordered</u>.